COURT OF APPEALS OF VIRGINIA

Present: Judges Malveaux, Raphael and Senior Judge Petty

RAVEN BROWN

v.  Record No. 1523-22-2

HENRICO DEPARTMENT OF
 SOCIAL SERVICES

MEMORANDUM OPINION* BY
JUDGE MARY BENNETT MALVEAUX
JANUARY 9, 2024

FROM THE CIRCUIT COURT OF HENRICO COUNTY
Richard S. Wallerstein, Jr., Judge

(Brandon S. Nexsen; Winslow, McCurry & MacCormac, PLLC, on
brief), for appellant. Appellant submitting on brief.

(Allison L. Bridges, Assistant County Attorney; Kelly B. St. Clair,
Guardian ad litem for the minor child, on brief), for appellee.
Appellee and Guardian ad litem submitting on brief.

Raven Brown ("mother") appeals the circuit court's order terminating her parental rights to

her child under Code § 16.1-283(C)(1) and (C)(2). She argues that the circuit court erred by finding

the evidence sufficient to terminate her rights. For the following reasons, we find no error and

affirm the circuit court.

## I. BACKGROUND[1]

"On appeal from the termination of parental rights, this Court is required to review the

evidence in the light most favorable to the party prevailing in the circuit court." *Yafi v. Stafford*

---

* This opinion is not designated for publication. *See* Code § 17.1-413(A).

[1] The record in this case was sealed, but this appeal necessitates unsealing relevant
portions of the record to resolve the issues raised by mother. Accordingly, "[t]o the extent that
this opinion mentions facts found in the sealed record, we unseal only those specific facts,
finding them relevant to the decision in this case. The remainder of the previously sealed record
remains sealed." *Levick v. MacDougall*, 294 Va. 283, 288 n.1 (2017). Additionally, we use
initials, rather than names, to protect the privacy of the minors mentioned in this opinion.

*Dep't of Soc. Servs.*, 69 Va. App. 539, 550-51 (2018) (quoting *Thach v. Arlington Cnty. Dep't of Hum. Servs.*, 63 Va. App. 157, 168 (2014)). Here, the Henrico Department of Social Services ("DSS") was the prevailing party.

Mother is the biological parent of J.T., the subject of this appeal, and J.J.[2] DSS first became involved with mother in 2018, when J.T. was nine months old. At that time, DSS investigated a report alleging physical abuse of J.T. by an unknown abuser, but DSS determined the report was unfounded. In 2019, DSS received a report alleging physical neglect of two-year-old J.T., lack of supervision, and lack of food in the home. DSS provided mother with mental health resources and assistance with transportation, childcare, and her finances.

In March 2020, DSS received a report alleging physical neglect of two-month-old J.J., who had been diagnosed with failure to thrive. When DSS asked mother who was caring for J.T. while J.J. was hospitalized, mother told DSS that she had left J.T. with "a friend," who was homeless and transient. DSS and mother agreed to place J.T. with his maternal great uncle and aunt.

One month later, the great uncle and aunt told DSS they were no longer able to care for J.T., and DSS petitioned to remove J.T. and place him in foster care.[3] In April 2020, the Henrico County Juvenile and Domestic Relations District Court ("the JDR court") entered emergency and preliminary removal orders. The JDR court subsequently adjudicated that J.T. was at risk of being abused or neglected and entered a dispositional order.

---

[2] J.T. and J.J. have different biological fathers. The parental rights of J.T.'s biological father had been previously terminated, and the record does not reflect that he appealed that ruling. Custody of J.J. was awarded to her biological father.

[3] Several additional maternal relatives expressed interest in providing kinship placement, but DSS determined that they were not viable placement options.

DSS established requirements for mother to meet before J.T. could return home. DSS required mother to: (1) provide a "clear and concrete plan for [J.T.'s] future to ensure his safety and well-being," (2) demonstrate that she could meet J.T.'s "physical, medical, financial, emotional, and educational" needs, (3) provide a "safe, stable home with suitable space, free from all negative influences," (4) obtain and participate in a "psychological/parenting evaluation and follow through with recommendations," (5) participate in individual therapy and an approved parenting course, (6) demonstrate an understanding of "age-appropriate and effective parenting skills," and (7) participate in visitations with J.T. Mother also had to inform DSS of any changes in her housing or employment.

Mother completed the psychological evaluation and parenting assessment. During that process, she disclosed that she had experienced a traumatic childhood, and the evaluator recommended that mother participate in "trauma-focused" counseling and medication management. The evaluator explained that having a trauma-informed therapist was "significantly important," so that mother and her counselor could discuss how childhood trauma affects adults and parenting. The evaluator also recommended that mother work with parent coaching services.

After reviewing mother's evaluation, the JDR court ordered mother to participate in individual counseling and parent coaching. Mother began counseling in August 2020 and parent coaching in October 2020. She also began receiving services to help with medication management.

In addition to referring mother to counseling and parent coaching services, DSS arranged for mother to have weekly supervised visits with J.T. in its offices. Initially, mother's visitation was "inconsistent" because of her work schedule or lack of communication. At times, mother worked two jobs or worked overnight, which limited her availability for visitations; in less than a

year, mother worked for at least five different companies. Mother's transportation issues also affected the visitation schedule. She did not own a car and relied on ride-hailing services and public transportation.

After a number of visits, DSS began occasionally to allow mother's sister to supervise the visits in the community. Once mother had a parenting coach, the supervised visits occurred at the parenting coach's offices and were "semi-supervised" by a parenting coach who remained in an adjacent room.

Mother also experienced housing issues that impacted her visitation. In February 2021, mother reported that her apartment had a "rodent infestation" and that she expected to move to another apartment in the same complex.[4] Mother would not allow DSS or her parent coaches to conduct a home visit. Because they were unable to view mother's home, DSS could not approve unsupervised home visits with J.T. or a trial home placement.

Additionally, mother lived in subsidized housing and had to complete recertification paperwork "justifying her rental assistance and her placement." In April 2021, mother received an eviction notice because she had fraudulently stated in her recertification paperwork that she was unemployed, even though she had been working. Mother acknowledged lying on her paperwork because her apartment was "infested with mice." DSS provided mother with housing resources, and mother moved to temporary housing at a hotel while she looked for permanent housing. Mother eventually moved in with a relative who did not want DSS to conduct a home visit.

Because of mother's unstable housing situation, she cancelled the majority of her visits with J.T. in April and May 2021. By June 2021, mother had resumed visiting J.T., but her work

---

[4] DSS offered to pay for an exterminator and provide mother with new furniture, but mother wanted to wait for a new apartment.

schedule precluded extended or overnight visits. DSS sought to suspend mother's child support obligation so that she could obtain her own housing and meet her other financial obligations.

As of September 1, 2021, mother still did not understand why J.T. was in foster care. She told DSS and her parenting coach that she "did not need parent coaching services and was only participating [in them] because she was told she had to." Despite having participated in DSS's parenting services for approximately one year, mother was unable "to articulate any changes or anything that she had learned from those services."

At a JDR court hearing on September 8, 2021, the court learned that J.T.'s biological father ("father") had tested positive for cocaine, methamphetamine, and opiates. After hearing that mother had allowed father to drive her to visitations and to drive J.T., the JDR court prohibited father from having any contact with J.T. and "question[ed]" mother's "judgment and discretion." The JDR court further noted that mother's conduct "absolutely violate[d] the spirit of the order and le[d] the court to question her future ability to keep [J.T.] safe." The JDR court also ordered mother and DSS to enter into a written visitation agreement, so that visitation could occur consistently and in a manner that was feasible for everyone involved in terms of timing and transportation. Mother, however, missed visits or tried to change the visitation schedule, and thus did not comply with the agreement.

By November 2021, mother had changed jobs again and moved into a new home, and DSS was working with her to establish a trial home placement. Mother cancelled or was late to several visitations between November 2021 and April 2022. She explained that sometimes, if she had been working overnight, she would be "extremely, extremely tired" and would "oversleep."

In early 2022, mother changed jobs multiple times, which negatively impacted her ability to have a trial home placement with J.T. She also missed the funding meeting for parent

coaching services, and thus her funding to receive those services lapsed. Mother told DSS that because of her work schedule, she could not participate in parent coaching services during the week anyway.

Despite these setbacks, DSS continued to work with mother toward a trial home placement and informed her that she needed to make childcare arrangements. Mother told DSS that J.T., who was then four years old, could stay home alone between 6:00 a.m. and 7:00 a.m., until daycare staff picked him up; DSS rejected this plan.[5] Once mother located a licensed daycare for J.T., DSS and mother agreed to a trial home placement plan for a placement to begin on May 7, 2022. The JDR court adopted and incorporated the trial home placement plan into an order. The order required mother to inform DSS of any changes in her employment, housing, or childcare plans. Mother also had to ensure that J.T. attended his therapy sessions, doctor's appointments, and dental appointments. If mother did not comply with the plan or there was a concern for J.T.'s safety or wellbeing, then DSS could remove J.T. from mother's home.

Two days after the trial home placement began, mother informed DSS that she had another job that she previously had not reported; accordingly, J.T. would be in daycare from 7:30 a.m. to 10:00 p.m. Mother's child subsidy, however, only covered 12 hours of daycare unless she provided additional documentation confirming her work hours. Mother told DSS that she would pay the difference between what the child subsidy covered and the daycare required, but she never did. DSS explained to mother that it was her responsibility to ensure that the child subsidy was being paid to the daycare.

While J.T. was in mother's care, DSS discovered that he had missed a previously scheduled dental appointment. Mother said that she did not take J.T. to his appointment because

_____

[5] Mother denied suggesting that J.T. could stay home alone. She testified that she had asked about taking J.T. to her aunt's house, from whence a daycare teacher would pick him up.

- 6 -

they had overslept.  Mother admitted that she did not get home the night before until 11:00 p.m. or 12:00 a.m. and that J.T. had been "watching stuff on his phone" until 3:00 a.m.  Mother allowed J.T. to watch videos while he was in bed and did not enforce a bedtime for him.  Mother also stated that she was looking for new employment because her work hours at one of her jobs had decreased and she no longer liked the supervisor there.

About two weeks later, mother told DSS that J.T. was going to the beach with his former foster parents on the weekend before Memorial Day.  On the Tuesday following Memorial Day, the parents called DSS to report that J.T. was still at their house.  They told DSS that mother had told them she had discovered that J.T.'s daycare would be closed on Monday due to the holiday; therefore, she asked the parents to watch J.T. because she did not have childcare during her work hours.  The parents offered to take J.T. to daycare the following day, so mother could pick him up after work; however, mother said that she could not do that because she was "having issues with the daycare."  Mother asked the parents to "keep" J.T. until she "figured out" alternative childcare.

After speaking with the former foster parents, DSS contacted mother, who reported that the daycare had not been paid.  DSS spoke with the child subsidy worker and discovered there was an "error in the system which did not allow the payment to be authorized," which was corrected as soon as the error was discovered.  The child subsidy worker also said that due to the number of daycare hours incurred by mother, she had asked mother to provide paystubs or verification of her work hours.  Mother had not provided the requested documentation.  Mother said that the daycare owner had been "disrespectful to her" and "she was not going to accept that" and that she wanted to look for another daycare provider.  Because mother had violated the trial home placement plan by not directly informing DSS of the changes in her employment and

childcare, and because she did not have a "concrete plan of care" for J.T., DSS sought to end the trial home placement.

On July 19, 2022, the JDR court approved a foster care goal of adoption for J.T. and terminated mother's parental rights. Mother appealed the JDR court's termination order to the circuit court.

At the circuit court hearing, DSS presented evidence of mother's lack of compliance with DSS's requirements for reunification. Mother had last visited J.T. on July 12, 2022, and had not asked DSS to see J.T. since that date.[6] She had only completed the parenting assessment and psychological evaluation and had not successfully completed parent coaching, parenting classes, the trial home placement, outpatient trauma-informed therapy, or medication management. Although mother previously had been compliant with her medication, DSS doubted that she was compliant at the time of the circuit court hearing. Mother did not have a current daycare plan, and the childcare subsidy had lapsed. DSS learned in August 2022 that mother had been evicted from her previous apartment.

Additionally, according to the family services specialist assigned to mother's case, mother had "continued to deny the reasons" that J.T. had entered foster care, did "not acknowledge any responsibility or belie[ve] that she is going to get anything out of services for him to be able to come home." Mother also had not demonstrated that she could meet J.T.'s "physical wellbeing needs, as well as his emotional needs." At the time of the circuit court hearing, J.T. had been in foster care for approximately two and a half years, and there was "no current plan for him to be able to come home safely."

---

[6] Mother testified that she had asked the foster parents about visiting J.T. since July 2022 but was told that she could not see him or talk to him.

J.T., however, had remained in the same foster home. While there, he successfully completed speech therapy, attended daycare, and participated in extracurricular activities such as soccer and swim lessons. After J.T. had experienced some "behavioral difficulties," DSS had referred him to play therapy to help him develop "appropriate coping skills." DSS also was exploring whether J.T. needed additional services because of occasional "aggressive outbursts."

Mother testified about the services in which she had participated. From August 2020 through May 2022, she attended weekly counseling via telehealth but admitted to missing some of her appointments. Although DSS did not believe that mother's counselor had a "trauma-related background," mother stated that she and her counselor had addressed her trauma and depression in their sessions. Mother testified that she had stopped counseling because she felt that she no longer needed it. Mother also had worked with a psychiatrist who prescribed medication to treat her symptoms from post-traumatic stress disorder. She admitted that she had stopped taking her medication in May or June 2021 because she did not like how it made her feel and believed she could "function better without it." She also claimed that she "d[id]n't need medication." In addition, mother had participated in parent coaching, which she found "helpful." She testified that through coaching, she had learned how to be a more involved and observant parent.

Mother testified that she had obtained a new job since the JDR court hearing and intended to hold only one job. She worked Monday through Friday in the afternoons and until 10:00 p.m., and occasionally on the weekends. If J.T. were returned to her care, mother would ask her aunt to watch J.T. while she worked. Mother also testified that she was willing to stop working and stay at home until she could find a job with work hours that matched J.T.'s school hours. When asked how she would be able to afford to do so, mother said that she "would push

herself and do what she need[ed] to do." Mother still did not have a driver's license and relied on public transportation.

Mother testified that she was "kind of behind" in her bills. In the summer of 2022, the management company for her apartment obtained a judgment against her; mother stated she had only paid rent "[a]bout three times" between November 2021 and September 2022. Mother blamed others for her eviction, however; she stated that although she had filled out her "part of the application" for rent relief, "[t]he rental office did not do their part." Following her eviction from her apartment, mother was "still holding over" there, but planned to live with her aunt so that she could pay her bills and save money for her own home.

At the conclusion of all the evidence, DSS requested termination of mother's parental rights to J.T. DSS emphasized that J.T. had been in foster care for more than two years and that despite DSS's efforts, mother was "more behind than ever" in achieving reunification. DSS stressed that mother's employment and housing were unstable and she had been "non-compliant" with therapy and medication. Although mother had "checked some boxes" by participating in some services, she had not demonstrated that she had "gained anything from those services." Meanwhile, J.T. had "a lot of needs, especially behaviorally," and required "stability and permanency" from his caregiver.

Mother emphasized her love for J.T., which the circuit court recognized, and stressed that she had participated in counseling for 18 months and parent coaching for 16 months. She sought psychiatric help and took medication for approximately one year. Mother had participated in visitation, which had progressed from supervised visitation to a trial home placement. Although the trial home placement had not gone well, mother asserted that it was not all her fault because DSS had failed to pay the daycare. Mother argued for the return of J.T. to her care.

After hearing all the evidence and argument, the circuit court terminated mother's parental rights under Code § 16.1-283(C)(1) and (C)(2). The court found that mother had "demonstrate[d] an inability to honestly assess her situation" and had "stated that she was only participating in services because she'd been told that she had to." Furthermore, mother had failed to "demonstrate an understanding" of why J.T. had entered foster care. The court considered the instability of mother's employment, finding that she had held "multiple jobs on a short-term basis," as well as the instability of mother's housing, including her recent eviction; the court noted that mother was "still holding over . . . notwithstanding the allegation of vermin being in the apartment." With respect to mother's plan to move in with an aunt and have her aunt provide childcare for J.T., the court noted that mother's plan was "not substantiated or corroborated by anyone." Ultimately, the court found, DSS had "gone to extraordinary lengths to attempt to provide services for [m]other," yet mother had "not pushed herself, nor done that which she need[ed] to do since [J.T.] came into care" and was not "much further along than she was when the child was placed into care." Accordingly, the court determined that it was in J.T.'s best interests to terminate mother's parental rights.

This appeal followed.

## II. ANALYSIS

"On review, '[a] trial court is presumed to have thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests.'" *Castillo v. Loudoun Cnty. Dep't of Fam. Servs.*, 68 Va. App. 547, 558 (2018) (quoting *Logan v. Fairfax Cnty. Dep't of Hum. Dev.*, 13 Va. App. 123, 128 (1991)). "Where, as here, the court hears the evidence *ore tenus*, its finding is entitled to great weight and will not be disturbed on appeal unless plainly wrong or without evidence to support it." *Fauquier Cnty.*

*Dep't of Soc. Servs. v. Ridgeway*, 59 Va. App. 185, 190 (2011) (quoting *Martin v. Pittsylvania Cnty. Dep't of Soc. Servs.*, 3 Va. App. 15, 20 (1986)).

Mother argues that the circuit court erred in terminating her parental rights to J.T. under Code § 16.1-283(C)(2). She notes that she participated in parent coaching, individual counseling, and psychiatric services. Although she had a "varied" work history, mother emphasizes that she has a "strong work ethic" and had never been unemployed for an "extended period." Mother acknowledges that attaining stable housing and reliable transportation have been "major issues in this case." Nevertheless, she asserts that she had "substantially complied with the services that were offered" and taken "positive steps towards being a better, more conscientious parent."

The circuit court found that clear and convincing evidence supported termination under Code § 16.1-283(C)(2), which authorizes a court to terminate parental rights if the court finds, by clear and convincing evidence, that it is in the best interests of the child to do so and that:

> [t]he parent or parents, without good cause, have been unwilling or unable within a reasonable period of time not to exceed 12 months from the date the child was placed in foster care to remedy substantially the conditions which led to or required continuation of the child's foster care placement, notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end.

"[S]ubsection C termination decisions hinge not so much on the magnitude of the problem that created the original danger to the child, but on the demonstrated failure of the parent to make reasonable changes." *Yafi*, 69 Va. App. at 552 (alteration in original) (quoting *Toms v. Hanover Dep't of Soc. Servs.*, 46 Va. App. 257, 271 (2005)). Further, "[t]he statute clearly contemplates that efforts to resolve the 'conditions' relevant to termination are constrained by time." *Akers v. Fauquier Cnty. Dep't of Soc. Servs.*, 44 Va. App. 247, 257 (2004) (quoting *Lecky v. Reed*, 20 Va. App. 306, 312 (1995)). This temporal constraint serves to "prevent the child from lingering

in foster care," as it is "clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming his [or her] responsibilities." *Tackett v. Arlington Cnty. Dep't of Hum. Servs.*, 62 Va. App. 296, 321-22 (2013) (alteration in original) (first quoting *L.G. v. Amherst Cnty. Dep't of Soc. Servs.*, 41 Va. App. 51, 57 (2003); and then quoting *Kaywood v. Halifax Cnty. Dep't of Soc. Servs.*, 10 Va. App. 535, 540 (1990)).

In the instant case, although mother participated in recommended services, such as the psychological evaluation, counseling, and parent coaching, she failed to remedy substantially the conditions that required J.T.'s continuation in foster care. While J.T. was in foster care, mother's housing and employment consistently remained unstable. At the time of the circuit court hearing, mother had been evicted from her apartment but was "still holding over" there. She had held multiple jobs, but only on a short-term basis, and although she admitted she was struggling financially, she said she could stay home with J.T. if she could not find suitable childcare.

Additionally, mother was unable to demonstrate an understanding of J.T.'s needs or why he had entered foster care. Despite mother having received parent coaching, when four-year-old J.T. visited her overnight, mother did not enforce a bedtime and allowed J.T. to watch videos on his phone until 3:00 a.m. During the trial home placement, mother missed J.T.'s dental appointment because she had overslept. The circuit court also heard from mother that she felt that she no longer needed counseling or medication, and so she stopped receiving those services.

Meanwhile, J.T. was doing well in foster care and receiving necessary services. At the time of the circuit court hearing, J.T. had been in foster care for more than two years. Mother had been evicted from her apartment and, for the reasons noted above, she still was not in a position to resume custody. Although mother testified that she intended to live with her aunt,

- 13 -

whom she thought could provide childcare, mother's plan was unsubstantiated and uncorroborated.

Considering the totality of the circumstances, including J.T.'s having remained in foster care well beyond the statutorily foreseen period, the circuit court did not err in finding that it was in J.T.'s best interests to terminate mother's parental rights and to terminate those rights under Code § 16.1-283(C)(2). Accordingly, we will not disturb the court's ruling.[7]

## III. CONCLUSION

For the foregoing reasons, the circuit court's ruling is affirmed.

*Affirmed.*

---

[7] Mother also assigns error to the circuit court for terminating her parental rights under Code § 16.1-283(C)(1). "When a lower court's judgment is made on alternative grounds, this Court need only determine whether any of the alternatives is sufficient to sustain the judgment." *Castillo*, 68 Va. App. at 574 n.9; *see also Fields v. Dinwiddie Cnty. Dep't of Soc. Servs.*, 46 Va. App. 1, 8 (2005) (holding that because the Court affirmed termination under one subsection of Code § 16.1-283 it did not need to address termination under another subsection). Here, because we hold that the circuit court did not err in terminating mother's parental rights under Code § 16.1-283(C)(2), we need not reach the question of whether the court erred in terminating mother's parental rights under Code § 16.1-283(C)(1).